IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

September 5, 2018 Session

## STATE OF TENNESSEE v. MARCELLUS HURT

**Appeal from the Criminal Court for Shelby County**
No. 15-04826        Lee V. Coffee, Judge

_____

### No. W2017-02179-CCA-R3-CD
_____

A Shelby County Criminal Court Jury convicted the Appellant, Marcellus Hurt, of aggravated assault, vandalism, and domestic assault. The trial court imposed a total effective sentence of sixteen years, eleven months, and twenty-nine days. On appeal, the Appellant contends that: (1) the trial court erred by allowing the State to argue a new theory during rebuttal, (2) the trial court erred by allowing the victim to testify regarding the cost of the repairs to his car; (3) the evidence was not sufficient to sustain his convictions of aggravated assault and felony vandalism; and (4) the trial court erred by sentencing the Appellant for a Class D felony for the vandalism conviction, by erroneously applying enhancement factors, and by imposing consecutive sentencing. Upon review, we agree that the trial court erred by admitting hearsay testimony regarding the amount of the damages. Therefore, we must reverse the Appellant's vandalism conviction and remand for a new trial on that charge. The Appellant's judgments are affirmed in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Reversed in Part; Case Remanded**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL, J., joined. ROBERT H. MONTGOMERY, JR., J., filed a separate opinion concurring in part and dissenting in part.

David S. Mays, Memphis, Tennessee, for the Appellant, Marcellus Hurt.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Kevin McAlpin, Assistant District Attorney General, for the Appellee, State of Tennessee.

# OPINION

## I. Factual Background

The Appellant was indicted for aggravated assault, being a felon in possession of a handgun, vandalism over $1,000, and domestic assault. The Appellant's charges stemmed from an altercation between the Appellant and the victim of the aggravated assault, Eddie Posey, over a minimal amount of marijuana. Two main disputes emerged at trial: (1) whether the State adduced sufficient proof regarding the cost of the repairs to the victim's car and (2) whether the Appellant used a gun or a pipe or tire iron during the assault of the victim.

During the trial, the victim testified that on the morning of March 21, 2015, he went to Eldridge Street to the house shared by his cousin, Carol Jenkins Hurt; her husband, Charles Hurt; and her stepson, the Appellant. The victim asked Mrs. Hurt to buy some marijuana for him, but she did not have any money. Mrs. Hurt offered the victim the ends of some marijuana cigarettes, which she called "cocktails" or "ducks," that she had saved in a jar for the victim and a neighbor. The Appellant thought the marijuana was his, and he began arguing with Mrs. Hurt. The victim was afraid the situation would "escalate," and he did not take the marijuana. The Appellant was angry and began beating Mrs. Hurt, who was sitting on a couch. Mr. Hurt tried to intervene, but the Appellant pushed him aside. Afterward, the victim walked toward the Appellant. The Appellant "swung" at the victim, and the two men began "throwing a few punches at each other." During the fight, the victim's hand was broken.

The Appellant told the victim, "'I'm going to get my gun. I'm going to shoot you.'" The victim was tired and afraid for his life, so he "broke and ran" across the street to Eirma Jenkins' house. Ms. Jenkins was the victim's cousin and Mrs. Hunt's sister. The victim recalled that when he reached the front steps of Ms. Jenkins' house, he heard a gunshot. The victim saw the Appellant shooting and picking up the shells.

The victim said that after he was safely inside Ms. Jenkins' house, he looked out the front door. The Appellant was "hollering and calling [the victim's] name," holding "a big gun," walking around the victim's Nissan Versa, and breaking all of the car's windows. When the Appellant hit the back windshield of the car with the gun, the gun fired. The victim said that the repairs to his car cost $8,700 and that he paid a $500 deductible. The victim identified photographs showing the damage to his car, and the photographs were admitted as exhibits.

The victim said that his cousin, Donzell Hykes, told him to step away from the front door before the Appellant shot him, and the victim complied. The victim did not want to call the police, but Mr. Hykes called the police. After breaking the windows in

the victim's car, the Appellant walked around the block for approximately ten minutes and then went into his house.

The victim said that he did not have a gun and that he never threatened to hurt or kill the Appellant. The victim said he confronted the Appellant in Mrs. Hurt's house to stop the Appellant before he killed Mrs. Hurt.

On cross-examination, the victim said that he went to Mrs. Hurt's house at approximately 10:00 a.m. Mr. Hurt was elderly and in "relatively good health"; however, he suffered a stroke sometime after the offense. The victim acknowledged that Mrs. Hurt "like[d] beer" but stated that he could not remember whether she was drinking when he arrived at her house. The victim denied drinking alcohol that morning. When asked to explain why he told the police in his March 21, 2015 statement that "'[w]e were sitting there, drinking,'" the victim explained that he must have been referring to "juice or something" because he would not have been drinking alcohol that early in the day.

The victim reviewed his police statement and acknowledged that it did not mention that the Appellant threatened to get his gun and shoot the victim; nevertheless, the victim said the Appellant made the threat and that he told the police about the threat.

The victim said that the Appellant "swung at" him and that they "got to fighting" but that he did not think the Appellant ever hit him. The victim explained that he did not know "who passed the first lick." He recalled that after the Appellant "swung at" him, he grabbed the Appellant, and the Appellant responded by grabbing the victim's testicles. Thereafter, the Appellant said he was going to get his gun and shoot the victim.

After the Appellant threatened to get his gun, the victim ran across the street to Ms. Jenkins' house where Mr. Hykes was working. The victim heard two or three gunshots. The victim said that he was running when the Appellant fired the first shot; therefore, he did not know whether the Appellant had fired in his direction. The victim said that "the second shot was not in [his] direction" but that he "saw the gun go off when [the Appellant] hit the back of [the victim's car] window."

The victim said that the Appellant had "a big gun," that it was "nickel plated," and that it might have been a .45 caliber or 9 millimeter. The Appellant had another gun, which was black, in his pocket. The victim saw the Appellant throw the black gun into the Hurts' house. The victim acknowledged that his police statement did not mention a second gun or that he had heard two or three shots; however, the victim maintained, "I know what I saw. I know he shot at me. I know he shot at me twice."

The victim conceded he did not tell the police that the Appellant picked up the discarded shell casings after the shooting, explaining he did not think "that was serious."

The victim acknowledged he did not testify at the preliminary hearing that the Appellant threw a second gun into the Hurts' house after walking around the block, explaining he must have "just forgot and left that out." The victim did not remember telling the police that the Appellant threatened to get a gun and shoot him. The victim stated that when the police approached the Appellant, the Appellant sat, put his hands behind his back, looked at the victim, and said, "I'm going to kill you."

The victim acknowledged that at the scene, he estimated to the police that the damage to his car would cost $1,500 to repair. However, the victim conceded that he was not an automobile mechanic, that he did not work for Kelly Blue Book, and that he did not have an official estimate at the time.

Defense counsel showed the victim his police statement and asked if he had told the police that the Appellant "shot, came back, knocked out the windows. When he hit the back window is when he shot again, then he shot at the house." The victim responded, "Maybe [the police] wrote it wrong. I told them that when I left out the house and I ran, he shot. And when he hit the back window, he shot. The gun went off."

Carol A. Hurt testified that the victim came to her home before noon. Mrs. Hurt was sitting in the living room drinking a beer and watching television. Mr. Hurt, the Appellant, and the victim were sitting on the porch. The victim came inside and asked Mrs. Hurt for money to buy marijuana. She responded that she did not have any money but gave him some marijuana "ducks" that she had saved in a cup. She thought the victim could make a marijuana cigarette from the "ducks."

Mrs. Hurt testified that the marijuana did not belong to the Appellant. Nevertheless, he was angry because she had given the victim the marijuana, and he began hitting Mrs. Hurt. Mr. Hurt and the victim intervened and began fighting the Appellant. Mrs. Hurt ran outside towards a neighbor's house, but the Appellant caught her and began hitting her again. Mr. Hurt and the victim followed them outside, and the victim fought with the Appellant. Mrs. Hurt saw the victim "jump up" and run across the street to Ms. Jenkins' house.

Mrs. Hurt said that she went back inside her house and was trying to lock the front door when the Appellant "kicked it in" and attempted to hit her. The Appellant ran toward the back of the house saying "he was going to get a gun" and "I'm going to shoot you, I'm going to shoot you." The Appellant went outside, and Mrs. Hurt heard a gunshot. She did not know if the Appellant "shot in the air or shot at [the victim] or shot the window. All [she knew] is [she] heard stuff shatter." She then saw the Appellant knock out the windows of the victim's car.

Mrs. Hurt recalled that after breaking the windows, the Appellant ran away and was gone for less than five minutes. Mrs. Hurt ran to a neighbor's house. The next time Mrs. Hurt saw the Appellant, he was in the back of a police car. Mrs. Hurt did not know who called the police.

Mrs. Hurt said that photographs were taken of her injuries immediately after the incident. Additional photographs were taken a couple of days after bruises developed from her injuries. Mrs. Hurt identified the photographs, and they were shown to the jury.

On cross-examination, Mrs. Hurt said that she was not sure whether she gave a statement to the police about the incident. She said she was drinking Colt 45 beer when the victim came to her house, which was probably in the afternoon or midday, not the morning.

Mrs. Hurt said she "could barely see" as a result of the injuries from the assault, but she knew the victim and the Appellant continued fighting outside the house because she followed them. The victim ran across the street, and Mrs. Hurt ran down the street, but the Appellant caught her and assaulted her again. Mrs. Hurt saw the Appellant break two or three of the car windows. She could not recall if the Appellant assaulted her before he broke the windows, explaining, "I remember certain things that happened and I can tell you accurately it happened, but I can't say in which order did it happen because it all happened so quick to me." Mrs. Hurt heard one gunshot but did not actually see the Appellant fire the gun. She received medical treatment following the assault.

Mrs. Hurt said that she had lived in the house with the Appellant for a couple of years. She had never seen the victim with a gun, but she might have seen the Appellant with a gun. Defense counsel showed Mrs. Hurt a pipe, and she identified it as one that had been on the front porch of her residence. She did not know if the pipe had ever been used for changing tires or shooting fireworks. Defense counsel submitted the pipe as an exhibit, describing it for the record as "a black and red item described as a pipe. Appears to be about 24 inches. 18 to 24 inches long."

Memphis Police Officer Jonathan DeMuth testified that just before noon, he was dispatched to Eldridge Street. The police received "numerous calls" reporting an incident that "started off as a disturbance, then it escalated to a fight, and then shots fired on the scene." Officer DeMuth and his partner, Officer Nikki Russell, arrived at the scene in separate vehicles at approximately the same time. Several people pointed toward a man, later identified as the Appellant, and said he had fired the shots. The Appellant "was covered in sweat and blood and was very raged." The officers detained the Appellant. A car was parked almost in front of the residence, and almost all of the car windows were broken.

Officer DeMuth said that he did not have a chance to speak with all of the people who were at the scene. While he was trying to control the situation, all but one person disappeared, which was not unusual. He explained that witnesses can be "afraid that they'll be retaliated against."

Officer DeMuth said that the police searched the area for a gun, including the Hurts' residence, but did not find a weapon. Mrs. Hurt "had terrible facial injuries. Swelling. Both of her eyes were blood red. It was pretty – pretty badly beat." Officer DeMuth did not notice whether Mrs. Hurt was intoxicated.

On cross-examination, Officer DeMuth acknowledged that his report reflected he was told to look for a "black automatic pistol." He testified that he did not find a pistol, bullets, gun case, or bullet holes inside the Hurts' house. No one had any gunshot wounds. He further noted that he did not find shell casings but that someone at the scene told him that the shell casings "were picked up."

Officer DeMuth said that he talked with Mr. Hykes at the scene. The Appellant was detained after other people at the scene "point[ed] at him as the armed person." The officers approached the Appellant and explained that they needed to detain him until they could determine what had occurred. Eventually, the officers cuffed the Appellant's hands behind his back and "coached" him into the back of a police car.

Officer DeMuth stated that Officer Russell "handled the assault portion" of the incident while he "handled the shots being fired at [the victim] and [the] vandalism." Officer DeMuth did not speak with Mr. Hurt or the neighbor, Robert Lee Howze. Officer DeMuth's involvement ended after the Appellant was transported to the police station.

On redirect examination, Officer DeMuth said that the officers were advised that the Appellant had picked up the shell casings; therefore, "it was not unreasonable for us not to find something that was picked up and disposed of prior to our arrival."

Officer DeMuth stated that his report reflected that "[t]hree shots were fired in the victim's direction" and that the estimated damage to the car was $1,500. Officer DeMuth never saw a bill for the repairs.

Officer Nikki Russell testified that she was dispatched to the scene to investigate multiple calls about an incident that was originally "a domestic" that was "upgraded to a shots fired." The scene was "very chaotic." Multiple people were pointing and hollering to indicate that a black man in the middle of the street was the perpetrator. The man, later identified as the Appellant, was not wearing a shirt. He was sweaty and bloody, and his demeanor was "very violent." The officers approached the Appellant and placed him in the back of a police car.

Officer Russell talked with Mrs. Hurt. Mrs. Hurt was upset and frightened, her eyes were swollen almost shut, and a "lot of blood [was] in [her] inner eye." A vehicle was parked in the street, and "there was glass everywhere." Officer Russell looked for a gun in the area, "but it was indicated that it had already been put away somewhere. It was ditched."

On cross-examination, Officer Russell said that the police "had a tough time getting . . . to [the Appellant]. That's how erratic and violent he was even with the police." The officers had to "struggle to get him detained and calmed down" but did not have to use force. The officers did not find a gun.

Donzell Hykes, Jr., testified that he was a carpenter and, sometime before noon, he was on a ladder working on the front of Ms. Jenkins' house. He heard a lot of noise and saw the victim run out of the house across the street. The victim ran up Ms. Jenkins' steps and into her house. Around that time, the Appellant came out of the house across the street with a gun in his hand. The Appellant was "aiming and . . . hollering, 'Come on out here. I'm going to kill you. I'm going to shoot you. Come on out this house.'" Ms. Jenkins came out of her house and yelled, "Don't be pointing that gun at my house. Don't be pointing that gun out here." Mr. Hykes said that Ms. Jenkins had a heart attack and was transported by ambulance to the hospital.

Mr. Hykes recalled that when the Appellant yelled for the victim to come out of the house, the Appellant pulled the trigger, "but the gun wouldn't shoot." The Appellant "tried to cock it or something . . . and then he got to shooting." The Appellant shot through the victim's car and "[s]tarted beating the hell out of it." The Appellant broke out the front and back windows of the car. The victim stayed inside Ms. Jenkins' house with the doors locked.

Mr. Hykes said that after the Appellant stopped shooting, he picked up a shell and ran down the street. Mr. Hykes estimated that the Appellant returned five to fifteen minutes later. Around the same time, Mrs. Hurt and "some other girl" were walking down the street. When the Appellant reached the Hurts' house, he saw Mrs. Hurt and "[k]nocked her clean off her feet." Mr. Hykes began yelling that the Appellant was "beating up" Mrs. Hurt, and the Appellant ran away. Almost simultaneously, the police and fire trucks arrived at the scene. The Appellant returned to the scene "as if nothing had happened" and was arrested.

On cross-examination, Mr. Hykes acknowledged that he was in custody on a vandalism charge and that he had prior felony convictions of possession of cocaine, burglary of a building, and vandalism over $1,000. Mr. Hykes asserted that he was not

testifying to gain favor from the State on any charge, noting that he had given a statement regarding the incident prior to being charged with vandalism.

Mr. Hykes acknowledged his police statement reflected that he said the Appellant's gun "went off," but he asserted that he thought the Appellant had to pull the trigger to make the gun fire. Mr. Hykes further acknowledged that he may have told the police the Appellant fired two gunshots into the victim's car; however, he thought he heard three shots. The chrome-plated gun was in the Appellant's right hand. Mr. Hykes could not say with certainty that the Appellant had picked up shell casings but surmised "what else would [he] be picking up?" Mr. Hykes thought he told the police and the defense's investigator that the Appellant had picked up shell casings. Mr. Hykes was shown the pipe Mrs. Hurt had identified earlier in the trial, and he said that he had not seen the pipe.

Officer Eric Carlisle described the process that he used to collect possible gunshot residue from the Appellant on the day of the offense. The sample was stored in the property room at the police station until it was transported to the Tennessee Bureau of Investigation (TBI) crime laboratory for testing. On cross-examination, Officer Carlisle said that testing revealed possible gunshot residue on the Appellant's right hand.

Detective Steven Foglesong testified that he took the sample to the TBI for testing. On cross-examination, Detective Foglesong acknowledged that the only witnesses who gave statements were the victim and Mr. Hykes. He further acknowledged that no testing was done to determine if the victim or Mrs. Hurt were impaired. Detective Foglesong conceded that the case began with an argument over marijuana but that neither the victim nor Mrs. Hurt were charged with an offense relating to marijuana.

Detective Foglesong said that his investigation revealed that the victim's broken hand resulted from his striking the Appellant in the face but that the victim was not charged with any offense. Detective Foglesong acknowledged that although the area was "canvassed thoroughly," the police never recovered a gun.

Detective Foglesong said that no shell casings or bullet holes were found at the scene or inside the victim's car. Detective Foglesong acknowledged the victim never told the police that he saw the Appellant with two guns or that the Appellant threatened to get his gun and shoot the victim.

Detective Foglesong said that the victim gave an estimate at the scene regarding the cost to repair the damage to his car, but Detective Foglesong did not specify the amount. Detective Foglesong never obtained an estimate from a repair shop and never confirmed that the victim owned the car.

Detective Foglesong thought the gunshot residue test was performed approximately twenty minutes after the Appellant arrived at the police station. Neither the victim nor his car was tested for gunshot residue. Although the Appellant's shirt was submitted to the TBI for gunshot residue testing, Detective Foglesong did not think it was ever tested.

On redirect examination, Detective Foglesong said that he never gave anyone a blood alcohol test or field sobriety test. He did not think that the victim, Mr. Hykes, or Mrs. Hurt was impaired.

TBI Special Agent Rielly Gray testified as an expert in gunshot primer residue analysis. She stated that testing determined that gunshot residue was on both of the Appellant's hands, indicating that he "could have fired, handled, or was near a gun when it was fired." She explained that "the best result [she] could have gotten was from the hands" and that the Appellant's shirt was not tested because she "found a positive result for GSR on the hand kit."

On cross-examination, defense counsel noted Special Agent Gray's opinion that the Appellant "could have fired, handled, or was near a gun" and asked if "'[c]ould have' is just another way of saying you're guessing, right?" Special Agent Gray responded, "It's up to one's interpretation, but yes."

Special Agent Gray acknowledged that she had read literature regarding the transfer of gunshot residue from one person to another person. She further acknowledged that she did not know "the contamination level that might have occurred prior to the sample being taken."

On redirect examination, Special Agent Gray said "with absolute certainty that there was GSR on the swabs that were taken from both the right and left hand of the [Appellant]."

Eirma R. Jenkins testified that Mrs. Hurt was her sister and that the victim and Mr. Hykes were her cousins. Ms. Jenkins lived "diagonally across the street" from Mrs. Hurt. Sometime before lunch, Ms. Jenkins and Mr. Hykes were outside the house talking while Mr. Hykes was on top of a ladder repairing some shingles on the roof. Ms. Jenkins saw the victim run across the street from the Hurts' house. The victim appeared to be upset and out of breath. The victim ran inside Ms. Jenkins' house then came back outside. When Ms. Jenkins saw the Appellant run out of the Hurts' house, she told the victim to go back inside her house. Ms. Jenkins saw the Appellant point a gun in the air and fire a shot. The Appellant then told the victim, "I'm going to kill you." Ms. Jenkins heard Mr. Hykes tell the Appellant not to come into the yard.

Ms. Jenkins said the Appellant approached the victim's car and pointed his gun at it, but the gun would not fire. The Appellant hit the car window with the butt of the gun and broke out all of the windows. The Appellant "ran around," and she assumed that he "went to hide something." Around that time, Ms. Jenkins' "defribrillator went off," and she was taken by ambulace to Methodist Hospital. Ms. Jenkins said that she heard only one gunshot that day.

On cross-examination, Ms. Jenkins said that the gunshot she heard occurred when the Appellant fired into the air. She recalled that the Appellant's gun was a silver nickel-plated gun.

The parties stipulated that "[the Appellant] was convicted pursuant to a guilty plea of a felony offense, to wit, burglary of a motor vehicle, a class E felony, February 3rd, 2011 in Shelby County Criminal Court . . . ." The trial court instructed the jury that the stipulation related to the charge alleging that the Appellant was a convicted felon in possession of a handgun and that the jury could consider the Appellant's prior felony conviction as an element of the charge but for no other purpose.

Charles Hurt, the Appellant's father, testified on the Appellant's behalf. Mr. Hurt said that on March 21, 2015, the Appellant came home around 9:30 a.m., and worked on his bicycle's flat tire on the front porch. The victim came to the Hurts' house, and Mrs. Hurt gave him a marijuana "runt" that belonged to the Appellant. The Appellant saw the marijuana, and the victim told the Appellant that he had gotten it from Mrs. Hurt.

Mr. Hurt said that the Appellant and Mrs. Hurt argued about the marijuana. Mr. Hurt said that he, the victim, and the Appellant began struggling. The Appellant hit Mr. Hurt twice on his side, and the victim hit the Appellant in the back. The Appellant asked, "Why you going to hit me?" The victim replied, "Brother, I'll hit you again if you jump on my cousin."

Mr. Hurt said that eventually the Appellant had the victim in a "choke hold." Mr. Hurt "broke them loose," and the victim ran out the door and across the street to Ms. Jenkins' house. Mr. Hurt looked out the windows and the door and saw the Appellant run to the side of the house. The Appellant returned with a tire iron, yelled, and then broke out every window in the victim's car. Mr. Hurt asserted that he never saw the Appellant with a gun.

Mr. Hurt acknowledged that the Appellant knocked out the windows in the victim's car and said that the Appellant tried to "jump on" Mrs. Hurt. Mr. Hurt did not know what caused the injuries to Mrs. Hurt's face. He recalled that Mrs. Hurt was drinking Colt 45 beer that morning and that she was "drunk."

On cross-examination, Mr. Hurt agreed that the Appellant was angry with Mrs. Hurt because she gave the victim some of the Appellant's marijuana. He also agreed that the Appellant attempted to assault Mrs. Hurt and that the victim came to Mrs. Hurt's defense. He further agreed that after the altercation, the victim ran from the Hurts' house, retrieved a tire iron, and broke out the windows in the victim's car. Mr. Hurt said that he did not see a gun or hear a gunshot. Mr. Hurt conceded that the Appellant was his son and that he did not want to see the Appellant get in trouble.

The forty-three-year-old Appellant testified that on the morning of March 21, 2015, he wanted to go to the store but discovered that the back tire on his bicycle was loose. He went across the street to Ms. Jenkins' house, borrowed a wrench from a man who was working on the house, returned home, and fixed his bicycle.

The Appellant said that he was on the porch when he heard Mrs. Hurt and the victim talking. The Appellant realized she had given the victim some of the Appellant's marijuana. He ran inside the house and asked Mrs. Hurt why she had given the marijuana to the victim. Mrs. Hurt responded that the victim paid for the marijuana. The Appellant said that the victim did not pay for the marijuana and "snatched" it away from him. The victim stood up, and he and the Appellant began arguing. Mr. and Mrs. Hurt got between the victim and the Appellant. The Appellant said that the victim put him in a choke hold, and the Appellant could hardly breathe. The Appellant grabbed the victim's penis so the victim would release him. The Appellant said that the victim pushed Mr. Hurt out of the way and "sw[un]g" at the Appellant. The Appellant said that he and the victim were fighting and wrestling, and Mrs. Hurt fell.

The Appellant said that he was mad and that he told the victim, "I got something for you." The Appellant ran outside and picked up a pipe that his nephews used to shoot bottle rockets and that Mr. Hurt used to change car tires. The Appellant ran to the front of the house and saw the victim running across the street. The Appellant claimed that he knocked the windows out of the victim's car with the pipe. Afterward, he threw the pipe in the yard, ran to a cousin's house, and "caught his wind." He said that he had cut his hand on a broken car window.

The Appellant acknowledged that he was not unfamiliar with the law and conceded that he had pled guilty to multiple felonies, including two counts of burglary of a motor vehicle and one count of selling drugs. The Appellant said that his having a gun during the offense was "just something [the State's witnesses] put together."

On cross-examination, the Appellant denied that he assaulted Mrs. Hurt. The Appellant said he was upset because Mr. Hurt did not want anyone smoking marijuana in the house, and Mrs. Hurt was "just doing what she wanted to do in my father's house,

sir." The Appellant said that he was not upset because Mrs. Hurt had given the victim his marijuana.

The Appellant acknowledged that while he was knocking out the victim's car windows, he was yelling for the victim to come out of Ms. Jenkins' house. The Appellant said that he knocked out the windows because he was mad and that he yelled at the victim because he wanted the victim to leave the house. The Appellant wanted the victim to come out of Ms. Jenkins' house because "if we going to fight, we going to fight like men." The Appellant acknowledged that he had a pipe in his hand, that he used the pipe to break the car windows, and that he threw the pipe in some grass after he broke the windows. The Appellant maintained that he did not intend to use the pipe on the victim.

The Appellant agreed that a pipe could inflict death or serious bodily injury but contended that he feared for his life and that he had to protect his father. The Appellant acknowledged that he was not in fear for his life when he broke the car windows and that he "wanted [the victim] to fight again."

The Appellant thought Mrs. Hurt was injured when she "caught an elbow" during his fight with the victim. The Appellant said he weighed 168 pounds, and the victim weighed 300 pounds. The Appellant denied assaulting Mrs. Hurt outside the house. The Appellant said that the State's witnesses who testified he assaulted Mrs. Hurt all "said something different."

The jury convicted the Appellant of aggravated assault, vandalism, and domestic assault. The trial court sentenced the Appellant as a Range II, multiple offender to consecutive sentences of ten years for the Class C felony aggravated assault conviction, six years for the Class D felony vandalism conviction, and eleven months and twenty-nine days for the Class A misdemeanor domestic assault conviction for a total effective sentence of sixteen years, eleven months, and twenty-nine days.

On appeal, the Appellant contends that (1) the trial court erred by allowing the State to argue a new theory during rebuttal, (2) the trial court erred by allowing the victim to testify regarding the cost of the repairs to the vehicle; (3) the evidence was not sufficient to sustain his convictions of aggravated assault and felony vandalism; and (4) the trial court erred by sentencing him for a Class D felony on the theft conviction, by erroneously applying enhancement factors, and by imposing consecutive sentencing.

## II. Analysis

### A. Rebuttal

On appeal, the Appellant contends that the trial court erred by allowing the State to introduce a new theory during rebuttal, namely that the Appellant used a pipe, not a gun, to assault the victim. The State responds that the rebuttal was in direct response to the Appellant's closing argument and therefore was not improper. We agree with the State.

The indictment charging the Appellant with aggravated assault provided that the Appellant "did unlawfully and knowingly commit an assault on [the victim] and use or display a deadly weapon and cause [the victim] to reasonably fear imminent bodily injury . . . ." During its case-in-chief, the State presented proof that the gun was the deadly weapon used in the assault. Although defense counsel questioned the State's witnesses about a pipe and implied that the Appellant had used a pipe, all of them responded that they had not seen the Appellant with a pipe. The Appellant testified that he did not have a gun but conceded he threatened the victim with the pipe.

In its closing argument, the State contended that the deadly weapon was the gun. The defense argued that the police never found a gun and that the Appellant used a pipe to break out the car windows and then threw the pipe in the grass.

Defense counsel objected as the State began its rebuttal, stating that he anticipated the State would discuss the pipe. The trial court overruled the objection as premature, stating, "I can't rule on what you think he might argue." The State continued, noting that the proof showed that the Appellant threatened the victim with a gun and shot at the victim as he ran from the Hurts' house. The State further noted that the indictment alleged the Appellant committed aggravated assault by causing the victim to "reasonably fear imminent bodily injury by use of or display of a deadly weapon," but it did not specify the type of weapon. At that point, defense counsel requested permission to approach the bench, which the trial court denied.

The trial court repeated its instruction to the jury that the "statements and arguments of counsel are not evidence." The court further instructed the jury that the State was not required to prove that the Appellant had a gun, just that the Appellant had a deadly weapon. The court explained the State was arguing that if the jury found the Appellant did not have a gun but instead had a pipe and that the pipe was capable of causing death or serious bodily injury, the pipe could be considered a deadly weapon.

The Appellant contends that the State's prosecution of the Appellant centered around the theory that the Appellant committed aggravated assault and that the weapon used was a gun. The Appellant notes that the State "opened and closed the case with the gun theory" and that the State presented witnesses who testified that they saw the Appellant with a gun or heard the gunshots. Additionally, the State presented proof that gunshot residue was found on the Appellant's hands. The Appellant contends that on

- 13 -

rebuttal, the State could not argue that the pipe was the deadly weapon the Appellant used. The Appellant argues that by finding the Appellant not guilty of being a felon in possession of a handgun but guilty of aggravated assault, the jury found that the Appellant did not have a gun. The State responds that its rebuttal was in direct response to the Appellant's closing argument and was therefore proper.

It is well-established that closing argument is an important tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments. See State v. Carruthers, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

Tennessee Rule of Criminal Procedure 29.1 governs how closing arguments in criminal trials are to be conducted. Rule 29.1(a) provides that "[a]t the close of the evidence, the state has the right to make the first closing argument to the trier of facts" and that "[t]he state's first closing argument shall cover the entire scope of the state's theory." Rule 29.1(b) provides that a "defendant shall be allowed to make a closing argument following the state's first closing argument" and that such "closing argument may address any relevant and proper subject and is not limited to matters actually argued by the state." Rule 29.1(c) provides that "[t]he state shall be allowed a final closing argument following the defendant's closing arguments" and that "[t]he state's final closing argument is limited to the subject matter covered in the state's first closing argument and the defendant's intervening argument." Further, Rule 29.1(d)(2) provides that the trial court

> shall ensure that no defendant is deprived of the opportunity to answer a new argument made by the state against that defendant . . . and that while the state, having the burden of proof, has the right to open and close the argument, this right shall not be exercised in such way as to deprive the defendant of the opportunity to fully answer all state argument. The court, on motion, shall enforce this purpose.

In the instant case, the State's rebuttal was in direct response to the Appellant's closing argument that he could not be guilty of aggravated assault because he used a pipe, not a gun. The State began its rebuttal by stating that the evidence established the Appellant used a gun but that, even by the Appellant's own admission, he had committed aggravated assault when he threatened the victim with a pipe, which could be a deadly weapon. In examining complaints regarding the State's rebuttal, this court has stated that "[w]here the criminal defendant raises an issue in his defense, he cannot complain of

- 14 -

references to the issue by the prosecution, or argument on that issue, so long as the argument is fairly warranted by the facts and circumstances of the case." State v. Sutton, 562 S.W.2d 820, 823-24 (Tenn. 1978); see State v. Osayamien Ogbeiwi, No. W2010-00117-CCA-R3-CD, 2011 WL 3276188, at *16 (Tenn. Crim. App. at Jackson, July 29, 2011). We conclude that the State did not introduce a "new theory" in its rebuttal and was responding to the Appellant's intervening argument. See State v. Houston, 688 S.W.2d 838, 841 (Tenn. Crim. App. 1984).

Further, the record reflects that the Appellant did not ask the trial court to allow him to respond to the State's argument pursuant to Tennessee Rule of Criminal Procedure 29.1(d)(2). See Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). We conclude that the Appellant is not entitled to relief.

## B. Cost of Repairs

The Appellant contends that the trial court erred by allowing the victim to testify regarding the cost of the repairs to the victim's car, arguing that his testimony consisted of inadmissible hearsay. During direct examination, the victim testified that he had the damage to his car repaired. The State then asked, "And do you know what it costs to have that repaired?" Defense counsel objected, arguing that the State's question called for hearsay because "[h]e asked him what someone else told him the repair was and that would be an out-of-court statement." The trial court did not respond to defense counsel's argument but instead stated, "He's asking him how much money he paid to have his car repaired. It would not be an out-of-court statement if he's asking that question." Defense counsel correctly stated that the court had mischaracterized the State's question. The State acknowledged that the victim had insurance but argued that the victim could testify to the cost of repairs to his own property. The trial court agreed, stating that the victim

> knows what the bill was to repair his car, how much he paid,
> how much the insurance may have covered, those are matters
> that the State has to prove. And those are things that he has
> within his personal knowledge of this is how much I paid out
> of pocket, and insurance paid a certain amount. Not a hearsay
> statement.

Defense counsel responded that the victim had failed to lay the proper foundation for the basis of his knowledge. Defense counsel asserted, "If the insurance company told him what the total amount of damage was, then he would – that would also call for hearsay. So unless they lay a foundation how do you know what this costs, they can't say that without invoking hearsay, which is an out-of-court statement." Defense counsel

acknowledged that if a bill or estimate had been provided to the defense, the defense would have had a reasonable opportunity to cross-examine the person who provided the bill. Defense counsel insisted the State needed to call the person who gave the victim the quote or made the repairs. Defense counsel noted, however, that in the instant case, "all we have is his testimony, which he can't testify to what the repairs are. He can only testify to what it cost him."

The trial court responded that the victim was testifying that "the car was damaged, this is how much the bill was, this is how much I was out of pocket, this is how much the insurance settled on." The trial court stated that the victim's information came from his personal knowledge and that "[h]e can testify to his personal loss and expenses that it costs him to get the car repaired, how much he was out of pocket, and how much insurance may have paid." The trial court overruled defense counsel's objection, and allowed the victim to testify that the total cost of the repairs was $8,700 and that he paid a $500 deductible. The victim did not say who repaired the car and did not say who paid the $8,700.

Later, the trial court made the following statement during a jury-out proceeding:

> The objection that was made earlier about the value and of [the victim] testifying the value, [701] – Rules of Evidence [701] indicates that value – that a witness may testify to the value of the witness's own property or services. So [701] under opinion testimony does, in fact, allow a witness to give an opinion about the value of his own personal property.

On appeal, the Appellant contends that the only testimony the State adduced regarding the amount of damage "was the inadmissible hearsay testimony of [the victim]." The Appellant contends that "[w]ithout credible evidence regarding the actual repairs from the actual source who can testify as to the nature of auto repairs, the evidence is insufficient for a conviction." The State responds that the victim was qualified to testify about the cost of the repairs and that his testimony was not hearsay. We agree with the Appellant.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is inadmissible except as provided by the rules of evidence or otherwise by law. Tenn. R. Evid. 802. "[H]earsay evidence has traditionally been excluded because of a fear that it is unreliable." Neil P. Cohen et al., Tennessee Law of Evidence, § 8.01[3][a] (6th ed. 2011). "The primary concern is that

the trier of fact will not be able to hear cross-examination of the declarant, who made the out-of-court hearsay statement." Id.

This court has observed that "Tennessee Rule of Evidence 602 limits a witness's testimony to matters for which sufficient evidence has been introduced to support a finding that the witness had personal knowledge of the matter. Rule 602 provides that such evidence 'may, but need not, consist of the witness's own testimony.'" State v. Kenneth Edward Watts, No E2010-00553-CCA-R3-CD, 2011 WL 5517000, at *3 (Tenn. Crim. App. at Knoxville, Nov. 8, 2011) (quoting Tenn. R. Evid. 602). Although "[n]on-expert witnesses giving testimony in the form of opinion are limited to opinions that are 'rationally based on the perception of the witness,' . . . property owners are explicitly allowed to testify as to the value of their property." Id. (quoting Tenn. R. Evid. 701); see State v. Rickman, 631 S.W.2d 448, 450 (Tenn. Crim. App. 1981) ("[A]n owner may testify as to the value of his personal property even though he may not qualify as an expert on its market value."). The vandalism statute provides that "[d]amage" includes "[t]ampering with property and causing pecuniary loss or substantial inconvenience to the owner . . . ." Tenn. Code Ann. § 39-14-408(a)(1)(B).

In the instant case, however, the victim was not giving his opinion on the value of his car but was testifying regarding the cost of the repairs to the vehicle. In State v. Nona Pilgram, No. E2004-00242-CCA-R3-CD, 2005 WL 602380, at *4 (Tenn. Crim. App. at Knoxville, Mar. 14, 2005), the defendant argued that the trial court erred by admitting the victim's hearsay testimony regarding the fair market value of her vehicle. The victim testified that before her vehicle was damaged, she received an unsolicited offer from a stranger in a bank parking lot to purchase her vehicle for approximately $4,500 to $5,000. Id. She estimated that the vehicle's value after the damages was between $3,000 and $3,500, explaining the number came from several estimates she received regarding the cost of repairing the damages to her vehicle. Id. at *2. This court acknowledged that "[t]he owner of the property is permitted to testify about her opinion of the value of the property." Id. at *5 (citing Tenn. R. Evid. 701(b)). This court further acknowledged that "the value of the cost of repairs is an appropriate means of determining the value of the damage sustained to the vandalized property." Id. (citing State v. Terry W. Bean, No. M2003-02062-CCA-R3-CD, 2004 WL 2412622, at *3 (Tenn. Crim. App. at Nashville, Oct. 28, 2004)). Nevertheless, this court concluded that the victim "was properly allowed to give her opinion of the diminution in her vehicle's value pursuant to Rule 701(b) [but] that the victim's testimony exceeded the permissible ambit of that rule because she testified not merely as to her opinion, but repeated hearsay as the basis of her opinion." Id. In other words, testimony based upon the victim's personal knowledge of the value of the victim's property, which normally is admissible pursuant to Rule 701, is not admissible if the victim's knowledge is based solely upon the hearsay statement of a third person (the declarant) which is made outside of court and is offered through the victim's

- 17 -

testimony for the truth of the matter asserted, as in this case, the total cost of repairs of the vehicle.

In the instant case, the Appellant challenged the victim's testimony because the State failed to establish the basis of the victim's knowledge of the cost of the repairs to his vehicle. The victim's testimony was clearly offered for the truth of the matter asserteed. We agree with the Appellant that the basis of the victim's knowledge was crucial to whether his testimony was hearsay. Because the victim merely was repeating what someone else said the cost of the repairs were, without having first-hand knowledge of the information, his testimony was inadmissible hearsay. See State v. Larkin, 383 N.W.2d 804, 805 (Neb. 1986). We conclude that the trial court erred by ruling that the victim's testimony was admissible.

As the Appellant noted, the trial court misconstrued the State's question to the victim. We agree that if the State had asked the victim how much he paid personally to have his vehicle repaired, his response would not have been hearsay because it would have been based upon his first-hand knowledge. That was not the State's question at trial. Instead, the State asked the victim what it cost to have the vehicle repaired, without eliciting the source of the information. Notably, the victim's testimony suggested that the repairs were paid for by his insurance company, that the only way he could have known the cost of the repairs was from information from a third party, and that he repeated the third-party information in court for the truth of the matter asserted, which is inadmissible hearsay. Clearly, the victim's testimony that the cost of repairs to his vehicle was $8,700 was what someone else told him; therefore, we conclude that the trial court should have excluded this testimony.

C.  Sufficiency of the Evidence

The Appellant contends that the evidence was insufficient to sustain his conviction of aggravated assault, maintaining that the jury did not believe he had a gun and that the pipe did not meet the statutory definition of a deadly weapon. See Tenn. Code Ann. §§ 39-13-102(a)(1)(A)(iii) (aggravated assault); 39-11-106(a)(6) (definition of deadly weapon). The Appellant also contends that the evidence was insufficient to sustain his conviction of vandalism of $1,000 or more but less than $10,000. See Tenn. Code Ann. §§ 39-14-408(b)(1) (vandalism); 39-14-105(a)(3) (value). The State contends that the evidence was sufficient to sustain the Appellant's convictions.

On appeal, a jury conviction removes the presumption of the Appellant's innocence and replaces it with one of guilt, so that the Appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The Appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a

reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom.  See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983).  In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts.  See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.  See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).  Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence.  See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

## 1.  Aggravated Assault

Aggravated assault as charged in the indictment occurs when a person intentionally or knowingly commits an assault, and the assault involved the use or display of a deadly weapon.  Tenn. Code Ann. § 39-13-102(a)(1)(A)(iii).  A person commits assault when the person "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury."  Tenn. Code Ann. § 39-13-101(a)(2).

The Appellant contends that the jury's acquittal on the felon in possession of a deadly weapon charge meant it necessarily concluded that the Appellant did not possess a gun; therefore, the evidence was not sufficient to sustain his conviction of aggravated assault.  The Appellant maintains that the jury must have convicted him under the State's "new pipe theory" and argues that the pipe or tire iron does not meet the definition of a deadly weapon.  The State urges this court not to engage in "inappropriate speculation" by "disturb[ing] seemingly inconsistent verdicts."  The State contends that the proof adduced at trial was sufficient to sustain the Appellant's conviction of aggravated assault. We agree with the State.

Our supreme court has examined whether inconsistent verdicts entitle a defendant to relief and concluded that "'the overwhelming authority supports the rule that consistency between verdicts on separate counts of an indictment is not necessary.'" State v. Davis, 466 S.W.3d 49, 76 (Tenn. 2015) (citing Wiggins v. State, 498 S.W.2d 92, 93 (Tenn. 1973)).  Our supreme court emphasized that "'[t]he validity accorded to [inconsistent] verdicts recognizes the sanctity of the jury's deliberations and the strong

policy against probing into its logic or reasoning, which would open the door to interminable speculation.'" Id. (quoting United States v. Zane, 495 F.2d 683, 690 (2nd Cir. 1974)). This court has explained that "in examining the sufficiency of the evidence, we look solely at the evidence regarding the convicting offense. We will not attempt to divine some hidden meaning from the jury's actions regarding a separate count of the indictment." State v. Finch, 465 S.W.3d 584, 602 (Tenn. Crim. App. 2013), overruled on other grounds by State v. Menke, 590 S.W.3d 455 (Tenn. 2019). Any inconsistencies in the verdicts have no bearing on whether the evidence was sufficient to sustain the Appellant's convictions.

We note that several of the State's witnesses, namely Mrs. Hurt, the victim, Ms. Jenkins, and Mr. Hykes, saw the Appellant threaten the victim with a gun. The Appellant's use of a gun was corroborated by the presence of gunshot residue on his hands. We conclude that the evidence was sufficient to sustain the Appellant's aggravated assault conviction. See State v. Terance P. Bradley, No. M2017-00376-CCA-R3-CD, 2018 WL 934583, at *6 (Tenn. Crim. App. at Nashville, Feb. 15, 2018); State v. Doyan Anderson, No. W2015-02405-CCA-R3-CD, 2017 WL 2275808, at *4-5 (Tenn. Crim. App. at Jackson, May 24, 2017).

2. Vandalism

The vandalism statute, Tennessee Code Annotated section 39-14-408, provides:

> (a) For purposes of this section:
> (1) "Damage" includes, but is not limited to:
> (A) Destroying, polluting, or contaminating property;
> (B) Tampering with property and causing pecuniary loss or substantial inconvenience to the owner or a third person;
> . . . .
> (b) A person commits the offense of vandalism who knowingly:
> (1) Causes damage to or the destruction of any real or personal property of another or of the state, the United States, any county, city, or town knowing that the person does not have the owner's effective consent;
> . . . .

At the time of the offenses, vandalism was a Class D felony if the value of the damage was $1,000 or more but less than $10,000. Tenn. Code Ann. § 39-14-105(a)(3).

Once again, the Appellant argues that "[t]he only testimony regarding the amount of damage was the inadmissible hearsay testimony" of the victim. As we stated earlier,

we agree with the Appellant. However, this does not end our analysis. We must determine what effect the erroneous admission of the hearsay testimony had on the Appellant's vandalism conviction.

Our supreme court "mandates that when conducting a sufficiency of the evidence review following a finding of erroneous admission of some evidence, the appellate court should conduct the sufficiency review based on the inclusion of the erroneously admitted evidence." State v. Ramie Anderson, No. M2005-02086-CCA-R3-CD, 2006 WL 2380604, at *9 (Tenn. Crim. App. at Nashville, Aug. 17, 2006) (citing State v. Longstreet, 619 S.W.2d 97 (Tenn. 1981)). The rationale underlying this mandate is two-fold:

> First, it is impossible to know what additional evidence the government might have produced had the faulty evidence been excluded at trial or what theory the government might have pursued had the evidentiary ruling of the trial court been different. A rule which would require the government to introduce all available evidence and assert every possible legal theory in anticipation of appellate reversal of trial court rulings would unduly prolong and clutter the original trial. Second, there is a risk that appellate courts would be less zealous in protecting the pretrial and trial rights of the accused if they knew reversal of a trial court's ruling would bar further prosecution.

Longstreet, 619 S.W.2d at 101 (citing United States v. Harmon, 632 F.2d 812 (9th Cir. 1980)). Our supreme court explained that

> "reversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case. As such, it implies nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect, e.g., incorrect receipt or rejection of evidence, incorrect instructions, or prosecutorial misconduct. When this occurs, the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished."

Id. (quoting Burks v. United States, 437 U.S. 1, 15 (1978). Therefore, we conclude that

the proper course is to reverse the Appellant's vandalism conviction and remand for a new trial on that charge.

## D. Sentencing

The Appellant's final issues concern various sentencing errors he claims were made by the trial court, including sentencing the Appellant for a Class D felony for the vandalism conviction, erroneously applying enhancement factors, and imposing consecutive sentencing. At the sentencing hearing, the Appellant's presentence report was submitted as an exhibit. The trial court found that the Appellant was a Range II, multiple offender. The trial court observed that the Appellant's actions "made no sense" and "escalated to a position that it never should have been." The trial court found that the Appellant had multiple criminal convictions in addition to those necessary to establish the appropriate range, including possession of a counterfeit substance, assault, theft, soliciting a ride, disorderly conduct, burglary of a motor vehicle, attempted burglary, aggravated criminal trespass, driving on a revoked license, and vandalism. Tenn. Code Ann. § 40-35-114(1). The trial court noted that a "validated risks and needs assessment" rated the Appellant "a high risk for violent crimes."

The trial court found by a preponderance of the evidence that the Appellant possessed and employed a firearm in the commission of the offenses. Id. at (9). The trial court further stated that the Appellant "was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed as an adult," noting that the Appellant had adjudications for selling cocaine, attempting to break into a car, and threatening his mother with a knife. Id. at (16). The court also found that the Appellant had been granted probationary sentences previously and that he had violated his terms of probation. Id. at (8). The trial court did not apply any mitigating factors.

The trial court sentenced the Appellant to ten years for the aggravated assault conviction, a Class C felony; six years for the vandalism conviction, a Class D felony; and eleven months and twenty-nine days for the domestic assault conviction, a Class A misdemeanor.

Regarding discretionary consecutive sentencing, the trial court found that the Appellant was an offender whose record of criminal activity was extensive, noting that

> most of his life, [the Appellant] has been arrested and charged with crimes. And, since he's been an adult, since the age of eighteen, there is probably not a period of time where you can look at more than six months or a year that [the Appellant] has not been arrested, has not been charged, has not been convicted for a variety of crimes, including property crimes

- 22 -

and including assaultive behavior committed against other people.

The court also found that the Appellant was a dangerous offender who had little hesitation in committing a crime in which the risk to human life was high. The court stated that the circumstances of the offense were aggravated, noting that "[t]his is a silly, nonsensical, violent offense" that began with an argument over two or three dollars worth of marijuana. The court stated the Appellant possessed a gun and fired shots in a populated area, risking injury to multiple people. The court also found "that the aggregate length of the sentences are reasonably related to the severity of the offenses for which the [Appellant] stands convicted" and "that consecutive sentences are necessary in order to protect Shelby County from further criminal acts by [the Appellant]."

The trial court found that the Appellant was a professional criminal, noting that the presentence report reflected that since the Appellant was a juvenile, he had committed multiple burglaries of motor vehicles, multiple assaults, theft, and vandalism. The Appellant reported having only one job and stated that the job lasted approximately one year, but the employment could not be verified.

The trial court ordered the Appellant's sentences to be served consecutively for a total effective sentence of sixteen years, eleven months, and twenty-nine days and denied alternative sentencing.

This court reviews the length, range, and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing). In conducting its review, the trial court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the Appellant to demonstrate the impropriety of his sentences. See Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.

1. Offense Classification

- 23 -

On appeal, the Appellant contends that the trial court erred by sentencing him for a Class D felony for the vandalism conviction. However, because we have concluded that the conviction must be remanded for retrial regarding the amount of the damages, this issue is moot.

## 2. Length of Sentences

Next, the Appellant challenges the length of the sentences imposed by the trial court. In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343 (quoting Tenn. Code Ann. § 40-35-210(d)). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

The Appellant contends that the trial court erred by applying enhancement factors (1), (8), and (9). Tenn. Code Ann. § 40-35-114(1), (8), and (9). Regarding enhancement factor (1), the Appellant admits that he has a history of criminal convictions but asserts that the history "does not include violent felonies." The Appellant argues "that use of criminal history alone to support a maximum sentence results in an illogical conclusion," noting that because an offender's criminal history determines his sentencing range, other factors should be required to impose the maximum sentence.

At the sentencing hearing, the trial court found that the Appellant had multiple criminal convictions in addition to those necessary to establish the appropriate range, including possessing a counterfeit substance, assaults, theft, soliciting a ride, disorderly conduct, burglaries of a motor vehicle, attempted burglary, aggravated criminal trespass, driving on a revoked license, and vandalism. Tenn. Code Ann. § 40-35-114(1). The trial court noted that the Appellant's prior criminal convictions included "violent offenses." The trial court did not err by applying this enhancement factor. This court repeatedly has approved of a trial court's imposing a maximum sentence upon applying enhancement factor (1) alone. See State v. Rickey Lee Brown, Jr., No. M2015-01730-CCA-R3-CD, 2016 WL 4973078, at *4 (Tenn. Crim. App. at Nashville, Sept. 16, 2016); State v. Minlando Cordell Young, No. M2014-00115-CCA-R3-CD, 2014 WL 4794997, at *4 (Tenn. Crim. App. at Nashville, Sept. 26, 2014). Thus, the trial court did not err by imposing the maximum sentences solely on the basis of enhancement factor (1). Nevertheless, the record reflects that the trial court also applied three other enhancement factors.

Regarding enhancement factor (8), the Appellant contends that "there is no support in the record that the [Appellant] failed to comply with conditions for release in relation to this charge, only that he violated probation in the past." Tenn. Code Ann. § 40-35-114(8). The Appellant has misconstrued this enhancement factor. Factor (8) provides for enhancement of a sentence upon finding "that before trial or sentencing, [the Appellant] failed to comply with the conditions of a sentence involving release into the community." The Appellant has cited no caselaw to support his argument. To the contrary, our courts have held that a prior history of probation violations is sufficient for application of this enhancement factor. State v. Jamie Crowell, No. W2017-00799-CCA-R3-CD, 2018 WL 2338209, at *9 (Tenn. Crim. App. at Jackson, May 23, 2018), perm. to appeal denied, (Tenn. Sept. 14, 2018); State v. Darrell Wayne Bumpas, No. M2017-00746-CCA-R3-CD, 2018 WL 817289, at *7 (Tenn. Crim. App. at Nashville, Feb. 12, 2018). We conclude that the trial court did not err by applying this enhancement factor.

Regarding enhancement factor (9), the Appellant contends that the trial court erred because the jury acquitted him of being a felon in possession of a gun; thus, "the jury determined there was no gun." Tenn. Code Ann. § 40-35-114(9). As we noted earlier, we do not agree that by acquitting the Appellant of that offense, the jury necessarily found that the Appellant did not have a gun. Regardless, the Appellant acknowledges that State v. Winfield, 23 S.W.3d 279, 283 (Tenn. 2000), held that a trial court could "apply an enhancement factor based on facts underlying an offense for which the defendant has been acquitted," but he argues that the trial court failed to make factual findings "to resolve the conflicts in the evidence and to make credibility determinations" as required by Winfield. The record belies this contention. At the sentencing hearing, the trial court found that the Appellant used a gun during the commission of the crimes.

The trial court did not err in applying enhancement factor (9) to his convictions of vandalism and domestic assault. However, because the use of a deadly weapon was an essential element of the offense of aggravated assault, we conclude that the trial court erred by applying enhancement factor (9) to the sentence for that conviction. See Tenn.Code Ann. § 40-35-114. Nevertheless, given the remaining enhancement factors, we further conclude that the trial court did not err by imposing the maximum sentences for each offense.

### 3. Consecutive Sentencing

Finally, the Appellant argues that the trial court erred by imposing consecutive sentencing. Generally, "[w]hether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court." State v. Adams, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997). Tennessee Code Annotated section 40-35-115(b) contains the discretionary grounds for imposing consecutive sentencing, and the imposition of a single ground "is a sufficient basis for the imposition of consecutive sentences." Pollard, 432 S.W.3d at 862.

Although the trial court also found that the Appellant was a dangerous offender and a professional criminal, we conclude that the trial court's decision to impose consecutive sentencing was justified solely by its finding that the Appellant had an extensive criminal history. This court has stated that "an extensive criminal history, standing alone, is enough to justify the imposition of consecutive sentencing." State v. Nelson, 275 S.W.3d 851, 870 (Tenn. Crim. App. 2008).

### III.  Conclusion

The Appellant's conviction of vandalism is reversed, and the case is remanded for a new trial on that charge. The Appellant's judgments are affirmed in all other respects.

_____
NORMA MCGEE OGLE, JUDGE